UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

BRANDY M. BROWN,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No.: 2:25-cv-14045-RMG

# FIRST AMENDED COMPLAINT

**COMES NOW** the Plaintiff, BRANDY M. BROWN, to sue the Defendant, FORD MOTOR COMPANY, for the causes of action stated herein. In support thereof, Plaintiff states:

## SUMMARY OF THE ACTION

1. Plaintiff, Brandy M. Brown ("Brown"), brings this action against Defendant, Ford Motor Company ("Ford"), to recover for the severe, permanent, and life-altering injuries she suffered when the defective Takata front passenger-side airbag inflator installed in her 2006 Ford Mustang (VIN 1ZVHT80NX65228407) (the "Ford Vehicle") unexpectedly ruptured, exploded, and shot metal shrapnel into her body during a low-speed vehicular collision on August 11, 2025.

2. Following an investigation of the accident and the Ford Vehicle, it was discovered that an OEM Takata airbag inflator installed in the Ford Vehicle suddenly ruptured and exploded during the collision and shot metal shrapnel throughout the vehicle's cabin. Due to the velocity of the blast, several metal fragments struck Brown in her face and head.

3. Astonishingly, Ford actually knew about the Takata airbag inflator's defectively dangerous condition years prior to Brown's incident, but delayed initiating a safety recall of the

Ford Vehicle and ultimately failed to notify Brown about the Ford Vehicle's defective and potentially lethal condition, all in blatant disregard of her health and safety. Brown therefore sues Ford to hold it responsible for the Ford Vehicle's defective condition and Ford's misconduct with respect to same.

### THE PARTIES, JURISDICTION & VENUE

4. Brown is a South Carolina citizen, resident, and domiciliary.

5. Ford is a Delaware corporation that is registered with and authorized by the South Carolina Secretary of State to do business in South Carolina.

6. Ford may be served with process by serving its registered agent: CT Corporation System, 2 Office Park Court, Suite 103, Columbia, SC 29223.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000.

8. This Court is authorized to exercise personal jurisdiction over Ford pursuant to S.C. Code Ann. §§ 36-2-802 and 36-2-803 because the causes of action stated herein arise out of and directly relate to Ford:

   a. Doing business in South Carolina;

   b. Transacting business in South Carolina;

   c. Contracting to supply services or things in South Carolina;

   d. Committing a tortious act in whole or in part in South Carolina;

   e. Causing tortious injury in South Carolina by committing an act or omission outside South Carolina where Ford regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in South Carolina; and

      f.    Producing, manufacturing, or distributing goods with the reasonable expectation that those goods are to be used or consumed in South Carolina and are so used and consumed.

9. This Court is authorized to exercise personal jurisdiction over Ford because Ford is engaged in substantial and not isolated activity within South Carolina.

10. Ford is additionally subject to personal jurisdiction in South Carolina for at least the following reasons:

    a. Ford operates, conducts, engages in, or carries on a business or business venture in South Carolina, and Ford has offices and a pervasive presence in South Carolina;

    b. Ford committed a tortious act within South Carolina;

    c. Ford caused injury to persons or property within South Carolina arising out of an act or omission committed outside South Carolina where, at or about the time of the injury, Ford (i) was engaged in solicitation or service activities within South Carolina, or (ii) products, materials, or things processed, serviced, or manufactured by Ford anywhere were used or consumed in South Carolina in the ordinary course of commerce, trade, or use;

    d. Ford committed a tortious act within this state by selling and delivering defective vehicles, including the Ford Vehicle, to persons in this state. Such vehicles, including the Ford Vehicle, were used by consumers in South Carolina in the ordinary course of commerce and trade;

    e. Ford conducted and engaged in substantial business and other activities in South Carolina by advertising, selling, and servicing Ford vehicles and component parts to persons in this state via distributors, wholesalers, dealers, and brokers. Such Ford vehicles were used by consumers in South Carolina in the ordinary course of commerce and trade;

    f. At all times material hereto, Ford designed, developed, manufactured, assembled, produced, distributed, and delivered Ford vehicles, including the Ford Vehicle, into the stream of commerce with the knowledge and intention that such vehicles would reach South Carolina and would be sold, purchased, used, and driven in South Carolina and by South Carolina citizens;

    g. The acts or omissions of Ford caused injuries to persons, including Plaintiff. At or about the time of said injuries, Ford engaged in solicitation activities in South Carolina to purposefully promote the sale, consumption, and use of Ford vehicles, including the Ford Vehicle;

    h. At all times material hereto, Ford designed, manufactured, distributed, and sold Ford vehicles and component parts with knowledge or reason to foresee that these vehicles and parts would be shipped in interstate commerce and would reach the market of South Carolina users or consumers;

    i. Ford actively does business in South Carolina and recruits South Carolina residents for employment;

    j. Plaintiff's claims against Ford are linked to, related to, and arise out of Ford's misconduct at issue in this case;

    k. Due process and notions of fair play and substantial justice are honored by this civil action going forward in this Court;

    l. There is little or no burden on Ford litigating this case in this Court;

    m. South Carolina has an overwhelming interest in overseeing this litigation because this case involves tortious injury caused to a South Carolina citizen within South Carolina;

    n. Public policy favors resolution of this dispute in this Court; and

    o. Ford's misconduct and its connection with South Carolina are such that Ford should reasonably anticipate being haled into court in South Carolina.

11. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the causes of action stated herein occurred in Walterboro, Colleton County, South Carolina.

## FACTUAL ALLEGATIONS

### A.   The Ford Vehicle & The Incident

12.   Ford is in the business of and derives substantial profit from designing, engineering, manufacturing, assembling, producing, inspecting, testing, distributing, selling, maintaining, repairing, and servicing a wide range of motor vehicles for consumer use and from procuring and installing the many component parts that go into manufacturing these motor vehicles. Ford purposely directs its business activities to South Carolina consumers and operates dozens of offices, dealerships, and service centers in South Carolina for the purpose of distributing, selling, and servicing Ford vehicles and products to South Carolina customers. Ford also engages in pervasive advertisement and marketing campaigns in South Carolina, including through the use of South Carolina-based television and radio networks, directed at promoting the sale and use of Ford vehicles and products in South Carolina.

13.   Ford vehicles sold in the United States and South Carolina, including the Ford Vehicle, contain defective Takata airbags. Ford purposefully distributes and delivers these defective vehicles and other products to South Carolina with the intention and expectation that they will be purchased by consumers in South Carolina and subsequently used in South Carolina.

14.   Ford designed, engineered, manufactured, assembled, produced, distributed, and sold the Ford Vehicle and procured, installed, and distributed many component parts used to produce the Ford Vehicle, including the Ford Vehicle's airbags, airbag inflators, and airbag systems. Ford subsequently advertised, marketed, promoted, distributed, delivered, and facilitated the sale of the Ford Vehicle.

15. After Ford finished manufacturing the Ford Vehicle, Ford distributed and delivered the Ford Vehicle into the stream of commerce with the intention and expectation that it would be sold, delivered, and driven in any and every U.S. State, including South Carolina.

16. On August 11, 2025, Brown was riding as a properly belted front-seat passenger when the Ford Vehicle was involved in a car accident that resulted in the front passenger-side airbag deploying.

17. When the Ford Vehicle's front passenger-side airbag deployed, the airbag's inflator suddenly ruptured, exploded, and shot metal shrapnel throughout the vehicle's cabin.

18. Due to the velocity of the blast, several metal fragments from the airbag inflator struck Brown in the face, head, and body, causing significant trauma.

19. At the time of the incident, the Ford Vehicle and its front passenger-side airbag components and systems—including the Takata airbag inflator—were in substantially the same condition as they were at the time they left Ford's final possession, custody, and control.

20. The incident involving Brown and the Ford Vehicle triggered the deployment of the Ford Vehicle's airbag safety system that was designed and manufactured to provide protection from injuries in such foreseeable types of crashes. However, instead of providing protection as intended, the airbag system catastrophically failed. The front passenger-side airbag inflator in the Ford Vehicle's airbag system ruptured and exploded upon deployment in this crash—shooting multiple metal fragments throughout the Ford Vehicle's occupant compartment and into Brown's body.

21. Evidence of the Ford Vehicle's punctured front passenger-side airbag and ruptured airbag inflator confirm what happened:




*Torn and bloodied airbag fabric*     *Metal shrapnel from ruptured inflator*

22.   And photographs of Brown's injuries leave little doubt about the horror of the event:




23. Brown's injuries would not have occurred but for the defects present in the Ford Vehicle and its component parts, including the incorporated Takata airbag inflator. These defects prevented a normal, safe, and expected airbag deployment in the Ford Vehicle at the time of the crash and, instead, caused shrapnel to expel from the front passenger-side airbag, maiming Brown.

24. Unfortunately, and as described further herein, Ford knew about the defective, unreasonably dangerous, and potentially deadly condition of the Ford Vehicle and its front passenger-side Takata airbag inflator, but failed to warn Brown or repair the Ford Vehicle's defective condition.

### B.   Background of the Ford Vehicle's Defective Airbag System

25. Ford selected Takata as its exclusive airbag module supplier for several vehicle lines (including for the 2006 Ford Mustang vehicle line), and Ford oversaw, participated in, and approved the design, manufacture, testing, and distribution of Takata's airbag inflator modules to be used in its vehicles. Ford ultimately approved, selected, and installed Takata's airbag inflator modules for the 2006 Ford Mustang vehicle line's passenger-side front airbag, and Ford installed one such Takata airbag inflator module in the Ford Vehicle's front passenger-side airbag system.

26. In general, the front passenger-side airbag is located directly in front of a vehicle's passenger seat and is stored inside the dashboard. When a collision occurs that calls for the front passenger-side airbag to deploy, the airbag is designed to break through a "tear-seam" on the back side of the dashboard as it inflates to cushion the passenger and protect him from injury.

27. As designed, the Ford Vehicle's Takata airbag system functions through various components, including collision sensors, an airbag control unit, an airbag inflator, and the airbag cushion. When collision sensors in the vehicle detect a collision, a signal is sent to the vehicle's airbag control unit. The signal sent from the sensors to the airbag control unit is

processed, and the airbag control unit determines the severity of the impact based on the input data. If the airbag control unit determines that an airbag deployment is necessary, it sends a signal to initiate the airbag inflator.

28. The airbag inflator consists of two components encased in a metal canister: (1) a propellant, and (2) an ignitor. The propellant is pressed into wafers or pellets and is encased in a metal canister. The ignition of the propellant causes an explosive chemical reaction that emits gas, resulting in the rapid inflation and deployment of the airbag cushion through the vehicle's steering wheel cover.

29. As the force of the collision reaches the passenger, he begins to move forward. By this time, the airbags are designed to be fully inflated and ready to receive and restrain the passenger's forward movement. The airbag is designed to inflate within a predetermined time limit in the range of fractions of a second, but only with the force necessary to cushion the passenger and protect him from colliding with the vehicle's interior.

30. When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators. Takata redesigned its airbags in the late 1990s for the ostensible purpose of making them more compact and reducing toxic fumes earlier models emitted when deployed. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

31. Although 5-aminotetrazole was widely viewed as a stable, safe, and effective propellant for airbags, it was more expensive to produce than vehicle manufacturers were willing to pay. As a result, beginning in the late-1990s, vehicle manufacturers, including Ford, pressured Takata and its engineers in Michigan to devise a lower cost propellant based on ammonium nitrate, a compound commonly used in fertilizer and explosives.

32. Ammonium nitrate is a dangerous material that should not be used in airbags. It is an inherently volatile and unstable chemical. Temperature changes as minimal as daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature fluctuations and moisture absorption cause it to break down over time, which in turn results in a violent detonation or the chemical becoming inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

33. According to an expert quoted in *The New York Times*, the only conceivable advantage to using ammonium nitrate as an airbag propellant is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which was not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for vehicle manufacturers, like Ford, and automotive executives ultimately pressured Takata's engineers in Michigan to develop a cheaper alternative.

34. As a result, vehicle manufacturers, including Ford, opted to install Takata's cheaper, more dangerous ammonium nitrate-based airbag inflator modules in their vehicles to cut costs and boost vehicle profit margins, all at the expense of the lives and safety of innocent American drivers and passengers.

### C.    Ford's Delayed Recall of Brown's Ford Vehicle

35. Notwithstanding Ford's actual knowledge of the defective nature of its vehicles containing Takata airbags, including Brown's Ford Vehicle, Ford did little to warn or protect consumers or the driving public.

36. Despite knowing about the Takata airbag defect as early as 2004—before Ford manufactured the Ford Vehicle, Ford persisted in using Takata's defective airbag modules and installing them in its vehicles, including in Brown's Ford Vehicle.

37. Moreover, despite Ford's knowledge of the defect and despite over a decade of receiving scores of confirmed reports of Takata's airbag modules rupturing, exploding, and injuring drivers and passengers, **including in Ford's own vehicles**, Ford failed to recall Brown's 2006 Ford Mustang **until January 2019**.

38. Astonishingly, on February 24, 2015, NHTSA opened an investigation relating to a Takata airbag rupture and injury in a Ford vehicle. At the conclusion of its investigation, NHTSA explicitly advised Ford to recall its vehicles containing the affected Takata airbag modules, including the 2006 Ford Mustang, but Ford **rejected** NHTSA's advice and refused to issue a recall. Equally astonishing, when NHTSA demanded that Ford provide an explanation for why its vehicles were experiencing airbag inflator ruptures that were injuring passengers, Ford again refused and remained silent.

39. Throughout 2015, 2016, 2017, and 2018, more and more Ford vehicles continued to experience Takata airbag ruptures that injured and maimed drivers and passengers across the country. For example, on November 9, 2016, William Hogan, Jr. sustained severe and permanent lacerations to his face, neck, and body when the Takata airbag inflator in his 2005 Ford Mustang ruptured during a crash event.

40. Finally, after succumbing to years of pressure from federal regulators and facing almost 14 years of irrefutable proof showing that the Takata airbags installed in its vehicles are defective, dangerous, and potentially lethal, Ford recalled Barnett's Ford Vehicle in January 2019.

41. Even then, however, Ford failed to ever actually notify Brown about the recall, her Ford Vehicle's defective condition, or the imminent danger she would be in if she rode in the vehicle. Sadly, Ford chose to leave Brown in the dark and knowingly subjected her to substantial safety and health risks.

42. Had Ford properly notified Brown and any other prior owners about the recall of and the dangerous and potentially lethal condition of the Ford Vehicle's Takata airbag, Brown never would have driven the Ford Vehicle that day and sustained serious injury.

43. To this day, Ford vehicles continue to experience Takata airbag ruptures that severely injure vehicle occupants, and the rate of incidents does not appear to be slowing:

   a. On March 15, 2018, Justin Johnson sustained ocular trauma and significant lacerations to his face when a Takata airbag inflator ruptured in his 2005 Ford Mustang.

   b. On February 23, 2020, Lilianne Gonzalez Morales and Yoan Machado sustained severe burn and laceration injuries when the Takata airbag in their 2006 Ford Fusion ruptured and caught fire.

   c. On June 20, 2021, Freddie Whitehead, III, sustained deep lacerations to his face and stomach when a Takata airbag inflator ruptured in his 2010 Ford Fusion.

   d. On July 7, 2022, Hayden Earl Jones, Jr. was killed when a Takata airbag inflator ruptured in his 2006 Ford Ranger, slicing his throat with sharp metal airbag shrapnel.

   e. On September 1, 2022, Thomas Barnett sustained a deep laceration and never damage to his right arm when the front passenger-side airbag inflator in his 2006 Ford Mustang ruptured.

## COUNT I—STRICT LIABILITY

44. Brown re-alleges and incorporates paragraphs 1 through 43 of this First Amended Complaint as if fully stated herein.

45. Ford designed, engineered, manufactured, assembled, produced, distributed, and sold the Ford Vehicle and procured, installed, and distributed the Ford Vehicle's component front passenger-side airbag inflator module.

46. Ford is responsible for placing the Ford Vehicle and its component front passenger-side airbag inflator module into the stream of commerce.

47. At the time the Ford Vehicle was placed into the stream of commerce, the Ford Vehicle and its front passenger-side airbag system and components were defective and unreasonably dangerous.

48. The Ford Vehicle and its component front passenger-side airbag inflator module were defective and unreasonably dangerous at the time they left Ford's final possession, custody, and control, and they remained substantially unchanged in this condition until the incident giving rise to this lawsuit.

49. The defective and unreasonably dangerous condition of the Ford Vehicle and its component front passenger-side airbag inflator module actually and proximately caused injury to Brown.

**WHEREFORE**, Plaintiff, BRANDY M. BROWN, demands judgment against Defendant, FORD MOTOR COMPANY, for all injuries and damages sustained as a result of the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, mental anguish, emotional distress, pain and suffering, punitive damages, costs, pre-judgment interest, post-judgment interest, and for any such further relief as the Court deems appropriate.

## COUNT II—BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

50. Brown re-alleges and incorporates paragraphs 1 through 43 of this First Amended Complaint as if fully stated herein.

51. The Ford Vehicle is a good.

52. Ford is a merchant with respect to the Ford Vehicle.

53. Ford sold the Ford Vehicle.

54. When Ford sold the Ford Vehicle, Ford impliedly warranted that the Ford Vehicle was merchantable and free of defects, would pass without objection in the trade or under the contract description, was of fair average quality within the description, was fit for the ordinary purposes for which such goods are used, runs of even kind and quality within each unit and among all units involved, and was adequately contained, packaged, and labeled.

55. However, when Ford sold the Ford Vehicle, the Ford Vehicle was not merchantable, was defective and unreasonably dangerous, was unfit for its ordinary purposes, was of poor and substandard quality, and substantially departed from the quality expected of such a product.

56. Ford therefore breached the implied warranty of merchantability that accompanied its sale of the Ford Vehicle.

57. Ford's breach of the implied warranty of merchantability actually and proximately caused Brown's injuries and damages.

**WHEREFORE**, Plaintiff, BRANDY M. BROWN, demands judgment against Defendant, FORD MOTOR COMPANY, for all injuries and damages sustained as a result of the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, mental anguish,

emotional distress, pain and suffering, punitive damages, costs, pre-judgment interest, post-judgment interest, and for any such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, BRANDY M. BROWN, hereby demands a trial by jury on all issues so triable.

Dated: January 23, 2026                Respectfully submitted,

/s/ *Cooper Klaasmeyer*
**COOPER KLAASMEYER, ESQ.**
Federal Bar No. 14272
**Morgan & Morgan, P.A.**
4401 Belle Oaks Drive, 3rd Floor
North Charleson, SC 29405
Telephone: (843) 73-5438
Email: cooper.klaasmeyer@forthepeople.com

**ANDREW PARKER FELIX, ESQ.**
Florida Bar No.: 0685607 *Admitted Pro Hac Vice*
**STEVEN E. NAUMAN, ESQ.**
Florida Bar No.: 106126 *Admitted Pro Hac Vice*
**Morgan & Morgan, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: (407) 244-3209
Email: andrew@forthepeople.com
Email: snauman@forthepeople.com
Secondary Email: kdimeglio@forthepeople.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 23, 2026, the foregoing document was electronically filed with the Clerk of Court for the District of South Carolina, Charleston Division, by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Cooper Klaasmeyer*
**COOPER KLAASMEYER, ESQ.**
Federal Bar No. 14272
**Morgan & Morgan, P.A.**
4401 Belle Oaks Drive, 3rd Floor
North Charleson, SC 29405
Telephone: (843) 73-5438
Email: cooper.klaasmeyer@forthepeople.com
